***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Deluca and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence. The Full Commission REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. The date of injury which is the subject of this claim is January 26, 2008.
2. On January 26, 2008, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. On January 26, 2008, defendant-employer employed three or more employees.
4. On January 26, 2008, defendant-employer was insured by the North Carolina League of Municipalities.
5. Defendants accepted plaintiff's claim as compensable by filing a Form 60 on October 20, 2008.
6. The issues before the Commission are what is plaintiff's proper average weekly wage to use for calculation of his compensation rate and whether plaintiff is entitled to additional disability and medical compensation, including treatment of plaintiff's seizures.
7. Stipulated Exhibits 1 and 2 were entered into the record.
 ***********
Based upon the greater weight of the competent and credible evidence of record in this matter, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 35 year old man with some college education in the field of law enforcement. Plaintiff lives in King, North Carolina, with his parents, where he has lived since November 2008.
2. Plaintiff began working full time for the Forsyth County Sheriff's Department in the Forsyth County Jail in May, 2003. Plaintiff's 2007 Forsyth County W-2 form indicated he earned $31,078.80 as a corrections officer with Forsyth County. Plaintiff principally earned his wages working for the Forsyth County Sheriff's Department. *Page 3 
3. Plaintiff also worked part time for TSI in Kernersville and earned $10.00 an hour working 10-30 hours per week. Plaintiff began this employment between the end of 2004 and beginning of 2005 and worked in their warehouse.
4. Plaintiff first began working for defendant-employer as a volunteer firefighter in 2001. He was not paid for any of the work he did for the fire department at that time. Defendant-employer later changed its guidelines so that some of its volunteer firefighters could be paid for some of the work they performed. Plaintiff returned to work as a firefighter for defendant-employer in 2006.
5. As of 2006, defendant-employer had four levels of firefighters in the fire department. The four levels included full-time firefighters, part-time fill-in firefighters, paid-on-call firefighters, and volunteer firefighters. Plaintiff was classified by defendant-employer as a paid-on-call firefighter.
6. Plaintiff was paid $6.15 per hour for responding to calls as a firefighter for defendant-employer. Plaintiff was required to perform a minimum of eight hours per month of firefighter activities, as well as four hours per month of training. Plaintiff was paid on an hourly basis for these activities. If plaintiff did not perform these minimum activities, his relationship with the fire department could be terminated.
7. Plaintiff decided at the time of each call whether or not he would respond to the call. Plaintiff was not reprimanded if he chose not to respond. Plaintiff's response to pages or calls was voluntary and response to every call was not required.
8. Plaintiff entered his time in a log book kept at the fire department. Plaintiff was required to keep up with his own time related to calls. Plaintiff received payment for the time that he entered in the log book. Plaintiff was not allowed to claim time for all work performed, *Page 4 
but was allowed to claim times when he responded to calls and some other activities. Defendant-employer did not always pay for plaintiff's response to every call. Calls to the fire station were categorized, with Tier I calls handled by staff present at the fire house and Tiers II and III calls used for more serious emergencies for which personnel were summoned to respond. Plaintiff responded to some Tier I calls without receiving payment.
9. Plaintiff performed some tasks for which he did not receive compensation, including when he cleaned equipment and trucks, when he refilled oil and water cans, and when he manned radios. At the hearing plaintiff described his work experience: "[M]ost of the stuff I done was volunteer. I stayed twenty-four hours at the station, volunteered, yes, on my own time, my choice. But, you know, the only time I got paid if I ran a call. I didn't get paid for those twenty-four hours that I done, and I cleaned up and stuff. I just got paid for my calls."
10. Plaintiff was allowed to respond to emergency calls in his personal vehicle or drive to the station and ride on station vehicles. Plaintiff was not reimbursed for mileage or for the use of his personal vehicle in his response to emergency calls.
11. Plaintiff received a paycheck at the end of each month from defendant-employer. At the end of the year, plaintiff received a W-2 from defendant-employer, which was not submitted as part of the evidence of record. There is no evidence in the record concerning plaintiff's actual wages from defendant-employer, but on all the forms submitted by defendants, plaintiff's average weekly wage is shown as $30.00 per week, which is the statutory minimum.
12. In the early hours of January 26, 2008, plaintiff responded to an emergency call from defendant-employer. Plaintiff proceeded in his personal vehicle to the fire department after his beeper sounded several times. Plaintiff was not paid for his response to the call on January 26, 2008. *Page 5 
13. Before plaintiff arrived at the fire department, plaintiff's truck collided with another emergency responder vehicle. Emergency Medical Services arrived at the scene. The medical reports indicate plaintiff lost consciousness and that he complained of head pain.
14. Plaintiff was transported by ambulance to Forsyth Hospital's Emergency Department. Plaintiff was treated for a concussion and left thigh and knee contusions. Emergency Department records note plaintiff had a large scalp hematoma. Plaintiff was instructed to follow-up with a neurologist, Dr. Bey. Plaintiff was instructed not to work for seven days.
15. Dr. Heidi Marlowe-Rogers, plaintiff's general practitioner, treated plaintiff after his motor vehicle accident. On January 30, 2008, Dr. Marlowe-Rogers assessed plaintiff with scalp laceration, facial contusions, subconjunctival hemorrhage, right hip pain, left knee pain, left thigh contusions and superficial abrasions elsewhere status post motor vehicle accident. Dr. Marlowe-Rogers prescribed Oxycodone, Valium, Ibuprofen, and Ambien. Plaintiff was written out of work from January 26, 2008 to February 10, 2008. On February 8, 2008, plaintiff returned to Dr. Marlowe-Rogers and she noted depressive symptoms in addition to the previous post motor vehicle accident impressions. Plaintiff was written out of work until February 25, 2008.
16. On February 21, 2008, Dr. Marlowe-Rogers continued to follow plaintiff's pain and symptoms related to the January 26, 2008 motor vehicle accident. Plaintiff was prescribed a left knee immobilizer on February 21, 2008. Plaintiff was written out of work until March 10, 2008. On March 6, 2008, plaintiff was seen again for left knee and right hip pain status post motor vehicle accident. It was noted that plaintiff required a left knee MRI and would likely need a referral to orthopaedics. *Page 6 
17. On March 27, 2008, plaintiff returned to see Dr. Marlowe-Rogers although he still had not received his MRI. Plaintiff was written out of work until April 14, 2008.
18. Plaintiff began orthopaedic treatment with Dr. Charles Taft on April 16, 2008. Plaintiff underwent a course of physical therapy as recommended by Dr. Taft. Dr. Taft allowed plaintiff to return to work on May 12, 2008 on a full duty basis. After physical therapy, plaintiff attempted to return to work for a few days, but was not able to perform his job at the Forsyth County Sheriff's Department. Plaintiff returned to work in May of 2008 using a sleeve on his left knee. Plaintiff's supervising lieutenant advised plaintiff that he could not return to work while using such a device and sent him home. Plaintiff testified that his knee pain and loss of function prevented him from returning to his employment with Forsyth County.
19. Plaintiff's position exposed him to jail inmates and the possibility of aggression from which he would be forced to defend himself. Forsyth County terminated plaintiff after determining that he was not capable of performing his duties as a corrections officer.
20. Plaintiff returned to Dr. Taft, complaining of ongoing symptoms. Dr. Taft wrote plaintiff out of work on June 5, 2008 as a result of left knee pain. Dr. Taft recommended a functional capacity evaluation (FCE) to determine plaintiff's limitations. A functional capacity evaluation was conducted on June 18, 2008. The FCE demonstrated that plaintiff could perform work at the medium level, although plaintiff was not able to sustain work activity for eight hours a day or for a full 40 hour work week. Swelling in plaintiff's left knee was noted at the end of the three and one half hour evaluation.
21. On June 25, 2008, Dr. Taft assigned plaintiff a 15% disability rating to the left lower extremity and released plaintiff from care and indicated plaintiff had reached maximum *Page 7 
medical improvement. Dr. Taft reiterated that plaintiff's condition prevented him sustaining medium level work for an eight hour day or a 40 hour workweek.
22. Plaintiff also received treatment at Salem Neurological Center specifically related to his head trauma. Dr. Howard Kraft noted at his initial evaluation on February 1, 2008 that plaintiff lost consciousness after the motor vehicle accident for 15 — 20 minutes. Plaintiff complained of memory problems, headaches, and dizziness. Dr. Kraft's impression was post-concussive syndrome secondary to the motor vehicle accident. It was further noted that recovery could take a month to several months and that a future treatment consideration would be an anti-depressant.
23. On June 6, 2008, Dr. Kraft's impression was that plaintiff was improving status post concussion from a motor vehicle accident. Dr. Kraft also noted anxiety very similar to post-traumatic stress disorder from the accident. Plaintiff was prescribed Cymbalta. On September 22, 2008, plaintiff returned to Salem Neurological to see Dr. Andreas Runheim because Dr. Kraft was no longer with the practice. Dr. Runheim released plaintiff back to work from a neurological standpoint after plaintiff expressed a desire to go back to work and begin exercising.
24. Plaintiff continued to work on a part-time basis at the TSI warehouse after his motor vehicle accident.
25. Plaintiff looked for work following his separation from Forsyth County in May of 2008. Plaintiff received an offer of employment, accepted that offer and participated in orientation with Baptist Hospital as a security officer. However, plaintiff failed a pre-employment drug screen required by the hospital and the job offer was rescinded. There is no *Page 8 
evidence to indicate whether plaintiff would have been able to perform the job requirements of this position due to his disability.
26. Plaintiff returned to see Dr. Marlowe-Rogers on August 1, 2008. Plaintiff noted that his depression and anxiety had worsened since the accident. It was also noted that his job with Forsyth County had been terminated. Plaintiff returned on September 12, 2008 as a result of an acute stress reaction. Plaintiff reported that he applied for a job at Baptist Hospital but failed a urine drug screening because of a trace of methamphetamine. Plaintiff denied any stimulant or amphetamine use.
27. On November 20, 2008, plaintiff returned to Dr. Marlowe-Rogers and reported that he had a seizure on November 15, 2008. Prior to the compensable accident, plaintiff had a similar episode in which he passed out, but this episode was diagnosed as an anxiety attack and a seizure was ruled out by his doctor. Dr. Marlowe-Rogers checked plaintiff's Dilantin level, advised plaintiff not to drive, and referred plaintiff for a seizure workup. Plaintiff testified that he was receiving treatment for the seizures from Dr. Stephanie Goddard, who had advised him that he should not drive a motor vehicle because of the seizures. The evidentiary record contains no medical records from Dr. Goddard. Therefore, the record contains insufficient evidence concerning plaintiff's seizures and their causal relationship, if any, to plaintiff's accepted compensable head injury.
28. Plaintiff testified that physical restrictions from the knee, in addition to post-concussion symptoms, affect his ability to perform work tasks and other activities of daily living. Plaintiff has reported symptoms of depression and anxiety. As of the hearing before the Deputy Commissioner, plaintiff was no longer employed at TSI and no longer connected with defendant-employer *Page 9 
because he failed to maintain his participation and training requirements. Plaintiff has looked for work and applied for jobs as a security officer, as well as at food service places.
29. Defendants have provided medical treatment for plaintiff's compensable injuries, including a head injury. Plaintiff alleges that he is entitled to receive additional treatment for his seizures, which has been denied by defendants. Defendants argue that plaintiff's compensation rate is the statutory minimum of $30.00 per week and have paid him one check for $565.70 for temporary total disability compensation from January 26, 2008 until September or October 2008.
30. As the result of his compensable injury by accident plaintiff was disabled and unable to earn wages in any employment from January 26, 2008 until June 25, 2008. After June 26, 2008, plaintiff was capable of some work but has been unable after a reasonable job search to find employment.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On January 26, 2008 plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff worked as a part-time on-call volunteer firefighter for defendant-employer. Plaintiff did not receive wages for all of the work he performed for defendant-employer. Work performed was of a hazardous nature and plaintiff did not expect to be compensated. Plaintiff chose which calls to respond to, and as long as he responded to a minimum amount monthly, his status remained the same. As such, plaintiff's relationship with defendant-employer more closely resembled that of a volunteer fireman rather than an employee. *Page 10 
The de minimus wages paid to plaintiff for some of his firefighting duties should not remove plaintiff from the statutory protections for volunteer firefighters.
3. N.C. Gen. Stat. § 97-2(5) specifically states that in case of a disabling injury to a volunteer fireman, compensation shall be calculated upon the average weekly wage he was "earning in the employment wherein he principally earned his livelihood as of the date of the injury." The Supreme Court in Dereberry v. Pitt CountyFire Marshall, 318 N.C. 192, 347 S.E.2d 814 (1986), stated that the "purpose of the average weekly wage basis [is] as a measure of the injured employee's earning capacity."Id. at 197, 347 S.E.2d at 817. The Court further explained the provisions of N.C. Gen. Stat. § 97-2(5) as follows:
 The statute does contemplate that persons to whom it applies might have multiple employments. The context of the statute, however, demarcates a person's voluntary and remunerative employments. The legislature employed the term `principally' to distinguish the fireman's volunteer employment from his other, renumerative employment or employments, i.e., `the employment wherein he principally earned his livelihood.' The statute insures that the injured volunteer fireman receives compensation commensurate with his proven earning ability as demonstrated by the wages he receives for work done other than in his capacity as a volunteer fireman."
Id. at 196-197, 347 S.E.2d at 817. In this case plaintiff's earning capacity is not demonstrated by the statutory minimum of $30.00 per week. N.C. Gen. Stat. § 97-29. Plaintiff's average weekly wage was $597.67 as a corrections officer, which is his employment where he principally earned his livelihood on the date of the injury. Plaintiff's compensation rate would therefore be $398.47 per week. N.C. Gen. Stat. § 97-2(5).
4. Defendants admitted the compensability of plaintiff's injury by accident on January 26, 2008 by filing a Form 60. However, the Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff.Sims *Page 11 v. Charmes/Arby's Roast Beef,142 N.C. App. 154, 542 S.E.2d 277, disc. review denied,353 N.C. 729, 550 S.E.2d 782 (2001).
5. In order to meet the burden of proving disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury.Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations.Demery v. Perdue Farms., Inc., supra.
6. In the instant case, plaintiff met his initial burden to show through medical evidence that he was disabled from any employment from January 26, 2008 through June 25, 2008. After June 25, 2008, plaintiff was capable of some work but has been unable after a reasonable job search to find employment.Russell v. Lowes Product Distribution, supra. Defendants have not shown that suitable jobs are available for plaintiff that he can obtain, taking *Page 12 
into account both his physical and vocational limitations.Demery v. Perdue Farms., Inc., supra.
7. As the result of plaintiff's compensable injury by accident, plaintiff was disabled and entitled to payment by defendants of total disability compensation at the rate of $398.47 per week from January 26, 2008 and continuing until plaintiff returns to work or further Order of the Commission. N.C. Gen. Stat. § 97-29.
8. As a result of plaintiff's compensable injury by accident, plaintiff sustained a 15% permanent partial impairment to his left leg. N.C. Gen. Stat. § 97-31(15).
9. Plaintiff is entitled to payment by defendants for all reasonable and necessary treatment for his left knee condition and headaches so long as the treatment effects a cure, gives relief, or tends to lessen plaintiff's period of disability. N.C. Gen. Stat. § 97-25.
10. In that the record contains insufficient evidence concerning plaintiff's seizures and their causal relationship, if any, to plaintiff's accepted compensable head injury, the Full Commission requires additional medical evidence before rendering a decision on this issue.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee awarded below, defendants shall pay plaintiff total disability compensation at the rate of $398.47 per week from January 26, 2008 and continuing until plaintiff returns to work or further Order of the Commission. The accrued amounts shall be paid to plaintiff in a lump sum. Defendants are entitled to a credit for total disability benefits already paid to plaintiff. *Page 13 
2. Defendants shall pay all medical expenses for plaintiff's compensable knee injury and headaches for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability.
3. A reasonable attorney's fee in the amount of 25% of the compensation awarded herein is approved for counsel for plaintiff. From the amounts having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check that would be payable to plaintiff thereafter.
4. Plaintiff's claim for medical compensation for his seizures is RESERVED. The Full Commission reopens the record for additional evidence concerning the seizure disorder, either by stipulation, written questions, or through deposition of the physician. All supplemental evidence shall be completed within 45 days from the date of this Opinion and Award. Additional evidence, stipulations, supplemental briefs and motions shall be submitted to Commissioner Mavretic. The Full Commission retains jurisdiction of this case, and upon receipt of the additional evidence, the Commission will render its decision on this issue.
5. Defendants shall pay the costs.
This 11th day of May 2010.
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ CHRISTOPHER SCOTT COMMISSIONER *Page 1